UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| LEAH MOREAU, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Docket No. 1:20-cv-01107-JD |
| MEDICUS HEALTHCARE SOLUTIONS, LLC, and MEDICUS HOSPITALIST SERVICES, LLC | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO BIFURCATE PROCEEDINGS

The Defendants Medicus Health Care Solutions, LLC and Medicus Hospitalist Services, LLC (collectively "Medicus" or Defendants), seek to bifurcate the proceedings in this matter and have the parties and the Court first decide Plaintiff's classification as an employee or independent contractor under the Fair Labor Standards Act. The Parties previously argued their positions to the Magistrate Judge at the preliminary pretrial conference, but she directed Defendants to file a motion for such relief to the Court. *See* Docket No. 43 at 2. Defendants offer this Memorandum of Law in support of their Motion to Bifurcate.

**I.   SUMMARY OF ARGUMENT**

This is a putative collective action under the FLSA, 29 U.S.C. § 216(b), seeking overtime pay. Defendants are in the business of finding temporary healthcare vacancies at hospitals and other facilities around the country and connecting medical professionals willing to fill the vacancies. Plaintiff is a nurse practitioner who contracted with Medicus Hospitalist Services to find her temporary placements and then agreed to work at a hospital in Houston for

approximately ten days in April 2020, fifteen days in May, and a dozen days spread over June to August 2020. During most of that time she also worked for herself in a practice she shares with her husband, a plastic surgeon. Under the applicable contract, attached hereto as Exhibit A, she agreed with Medicus she was an independent contractor, was paid $80-85 hourly and on several occasions paid time and half, $120-127.50 hourly, when she worked more than 12 hours per day. Plaintiff alleges that she was really an employee and thus under the FLSA should have been paid time-and-a-half for hours in excess of forty hours per week. *See* Complaint ¶¶47-49. Defendants plan to defend based on their lack of control and absence of any supervision, daily or otherwise, over Plaintiff who worked at a hospital half the country away from Medicus' facilities in New Hampshire, without any equipment, tools, or direction from Medicus, and was free to accept or refuse work, free to negotiate the rates paid to her (including bonuses), and free to hold other jobs.

There are two driving issues in this litigation. First, was Plaintiff properly classified as an independent contractor such that the FLSA doesn't apply? Second, should this case be certified as a collective action? The order in which the Court decides these issues, classification and certification, has a huge impact on the amount of time, expense, and judicial resources that will be devoted to this case. Defendants believe the Court should first decide classification, i.e., whether Plaintiff was an independent contractor, before engaging in the difficult, time-consuming, and expensive process of certification of a class that includes different types of professionals, located at different facilities all across the country. Defendants acknowledge this is not the typical order in FLSA collective actions, but just because it is unusual doesn't mean it isn't the right way to handle this particular case.

As explained in more detail below, there are four reasons the Court and the parties should first focus on the classification issue:

- ***Collective Action Certification Is a Case Management Tool, Not a Requirement.***

The widely used procedure for deciding certification of a collective action ("conditional certification" of a collective, notice to potential class members, opt-in by class members, further discovery and litigation, and then second-stage certification briefing and decision) was adopted as a case-management tool to help courts decide, in their discretion, whether and when to notify out-of-court, similarly situated FLSA claimants of the possibility of joining an FLSA suit. It is not required by the FLSA or the rules of civil procedure. Courts can and do decide merits issues before certification when that is the best approach to case management. *See infra* Part IV.

- ***Deciding Classification Is Comparatively Simple and Will Help with a Later Decision on Certification.***

Deciding the classification issue through summary judgment will be straightforward because the parties' relationship is outlined in the agreement between them and limited discovery will be able to quickly ferret out any facts outside of the structure of the contractual relationship that are relevant to Medicus' control over Plaintiff and the other factors under the FLSA. Deciding classification first also has the benefit of making the certification analysis easier. Summary judgment will identify what facts are important for the classification issue, and thus allow the court to assess whether the putative collective action members are sufficiently similar to allow their claims to be litigated together. In other words, summary judgment will allow the parties and the Court to determine if Plaintiff's claim relies on (a) individualized facts about her interactions with Defendants, a uniqueness that makes certification more problematic, or (b) the

structure of the relationship (finding temporary work at other facilities and paying the temporary worker) which is uniform across the class members.  *See infra Part IV.A.*

- ***Deciding Certification First Risks Bogging Down a Later Decision on Classification In Individual Issues or Wasting the Parties and the Courts' Efforts on a Meaningless Decision.***

On the other hand, deciding certification first will create a much more difficult litigation path, and likely be a waste of time and resources.  The Court will first have to decide whether the putative class is "similarly situated" under prevailing law, considering that the class consists of different types of professionals, doing different jobs in different states at different types of facilities.  That decision will not have had the benefit of focused briefing on the classification issues, leaving the Court and the parties to speculate about what similarities between the class members really matter.  Beyond that, if a class is conditionally certified and other workers are allowed to opt-in, deciding classification at summary judgment will be extremely cumbersome, involving numerous motions focused on the individual facts and situations of the different opt-in plaintiffs.  That difficulty would be considerably lessened if the Plaintiff and class members do not rely on their individual circumstances, but instead attack the general structure of the relationship with Medicus.  But if that is the case, the certification discovery, briefing, and decision would have been a waste of time – the Plaintiff's challenge to Medicus' model can be effectively tested with a single summary judgment motion filed by a single plaintiff.  *See infra Part IV.A.*

- ***There Is No Prejudice to Plaintiff or the Class.***

Deciding classification on summary judgment first has no downsides.  It will avoid unnecessary class discovery and certification briefing if Plaintiff was correctly classified as an independent contractor.  Even if summary judgment is denied, it will allow the parties to better tailor and

streamline class discovery based on the Court's ruling on classification. Plaintiff argued to the Magistrate Judge that delaying certification will cause statute of limitations problems for future opt-in plaintiffs, but Defendants are willing to stipulate to tolling to alleviate this concern, and the FLSA permits equitable tolling to prevent this. *See infra* Part IV.B.

The Defendants have attached a draft order, which they believe will affect the bifurcation of issues as requested in this Memorandum. It is attached as Exhibit C.

## II.     FACTUAL BACKGROUND

The Plaintiff is a nurse practitioner. *See* Complaint ¶29. She entered into an "Independent Physician Agreement" with one of the defendants, Medicus Hospitalist Services, LLC ("Medicus Hospitalist"). *See id.* ¶44; *see also* Agreement, attached hereto as Exhibit A.[1] Under the Agreement, she contracted with Medicus Hospitalist to find her temporary "locum tenens" placement at medical facilities. *See* Agreement, "Terms of Agreement" Section. The parties agreed to treat their relationship as an independent contractor relationship, not an employment relationship. *See id.* § 9. Thus, Plaintiff agreed that Medicus would not "have any control over the means and method of the professional services provided by Physician hereunder." *Id.* For each placement, the Parties executed a "Schedule A," which outlined the dates and times Plaintiff agreed to work, the facility she was working, and her rate of pay, all of which were a function of the hospital's offering. The Schedule As are included in Exhibit A and show that Plaintiff agreed to work shifts on ten days in April 2020 for Houston Medical Methodist Specialty Physician Group at a hospital in Katy Texas, 15 days in May 2020, five days in June 2020, four days in July 2020, and three days in August 2020. Her agreed pay rate ranged

---

[1] Notwithstanding the title of the Agreement, Plaintiff was not a physician but a nurse practitioner.

5

from $80/hour to $85/hour – up to $127.50 hour for hours above twelve worked on a single shift. *See id.*

Plaintiff alleges that, in fact, she was an employee of both Medicus entities. The key allegations are that (1) Medicus "exercises control over the hours and location Moreau works, tools and equipment she uses, and rates of pay she receives," Complaint ¶54, (2) "[n]o real investment is required of Moreau to perform her job," *id.* ¶56, (3) Medicus "effectively prevented (or outright prohibited) her from working other jobs for other companies while working on jobs for Medicus," *id.* ¶61, and (4) "the daily and weekly activities of Moreau and the Putative Class Members are routine and largely governed by standardized plans, procedures, and checklists created by Medicus and its clients," *id.* ¶64.

Medicus will present evidence at summary judgment that those allegations are false. Plaintiff was free to accept or reject any temporary assignment Medicus provided to her. In fact, she did refuse offered work dates if they conflicted with her social schedule, childcare, or her work at her and her husband's practice. She was also free to accept, reject, or negotiate over her rate of pay. In fact, she did negotiate her rate of pay, including demanding bonuses before agreeing to certain work dates. Medicus exercised no day-to-day control or supervision over Plaintiff's work, and indeed, Medicus isn't in the business of healthcare and has no ability to supervise the medical judgement and work of a medical professional like Plaintiff. Medicus did not effectively prevent or prohibit Plaintiff from working elsewhere and, given the very few days Plaintiff worked over the spring and summer of 2020, she was able to and did in fact work for her and her husband's practice. Finally, Plaintiff's work is not routine but involves highly specialized medical decision-making over which Medicus set no policies or rules whatsoever. In

other words, Medicus found her a temporary professional work assignment with another entity; it did not employ her.

Procedurally, the case has just started. The parties have exchanged document discovery and are discussing depositions. Under the current scheduling order, Plaintiffs are to file their motion for conditional certification as a collective action by March 15, 2021. Thus, now is the appropriate time to consider the best schedule for the case.

### III.   THE RELEVANT LAW ON CLASSIFICATION AND CERTIFICATION IN FLSA COLLECTIVE ACTIONS.

#### A.   The "Economic Reality" Test and Classification.

Under the FLSA, employees are entitled to overtime pay, unless they are exempted, but independent contractors are not. The prevailing test in the First Circuit for determining whether a worker is an employee for purposes of the FLSA or an independent contractor is a multi-factor test called the "economic reality" test. *See Baystate Alternative Staffing v. Herman*, 163 F.3d 668, 675 & n.9 (1st Cir. 1998); *Chesley v. DIRECTV, Inc.*, 2015 DNH 115 n.2, 2015 WL 3549129, Docket No. 14-cv-468-PB (D.N.H. June 8, 2015). The First Circuit has never expressly adopted it, but the District Courts around the Circuit have generally adopted a six-factor test. *See Levi v. Gulliver's Tavern, Inc.*, Docket No. 15-216-WES, 2018 WL 10149710, 2018 U.S. Dist. LEXIS 231844 (D.R.I. Apr. 23, 2018); *Chebotnikov v. LimoLink, Inc.*, Docket No. 14-13475-FDS, 2017 U.S. Dist. LEXIS 104577, at *34-*35 (D. Mass. July 6, 2017); *Bolduc v. National Semiconductor Corp.*, 35 F. Supp. 2d 106, 112 (D. Me. 1998). The factors are

> 1) the degree of control exercised by the employer over the worker;
> 2) the worker's opportunity for profit or loss;
> 3) the worker's investment in the business;
> 4) the degree of skill and independent initiative required to perform the work;
> 5) the permanence or duration of the working relationship; and
> 6) the extent to which the work is an integral part of the employer's business.

7

*See Bolduc*, 35 F. Supp. 2d at 112.

      **B.**      **"Certification" of FLSA Collective Actions.**

Under the FLSA, a plaintiff may bring a suit on her own behalf as well as "other employees similarly situated." 29 U.S.C. § 216(b). Courts around the country, including this court, have adopted a two-stage process to determine whether to allow an FLSA case to proceed as a collective. *See Camp v. Bimbo Bakeries USA, Inc.*, 2019 DNH 020, 2019 U.S. Dist. LEXIS 17127, *4 (D.N.H. Feb. 4, 2019).[2] Commonly called the *Lusardi* approach after *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), it is not required by the FLSA but is instead meant to implement the Supreme Court's decision in *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989), that District Courts have the discretion to facilitate notice to workers of their ability to opt-in to an ongoing FLSA case. *See Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 & n.10 (2d Cir. 2010). It is thus primarily a case management tool. *See Chavira v. OS Rest. Servs., LLC*, Docket No. 18-cv-10029-ADB, 2019 WL 4769101, 2019 U.S. Dist. LEXIS 167935, at *22 (D. Mass. Sep. 30, 2019).

Under the first stage, called "conditional certification" or the "notice stage," the plaintiff must make a showing that "there is a reasonable basis for [her] claim that there are other similarly situated employees," i.e. that there are other workers that "have similar (not identical)

---

[2] The First Circuit has never formally adopted the approach though it has hinted at it. *See Roberts v. TJX Cos.*, Docket No. 13-cv-13142-ADB, 2017 U.S. Dist. LEXIS 49174, at *8-*9 (D. Mass. Mar. 31, 2017). In *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 58-59 & n.15 (1st Cir. 2013), the First Circuit recognized that "Rule 23 and the FLSA impose different certification requirements" but did not expressly adopt the two-stage certification approach because the parties in the case treated the certification standards as the same. A year earlier in *Cruz v. Bristol-Myers Squib Co.*, the Court of Appeals described the certification process in the ADEA (which incorporates the FLSA "similarly situated" standard for collective actions), as similar to the two-stage certification procedure other circuits have used in FLSA cases. *See* 699 F.3d 563, 569 (1st Cir. 2012) (citing Second, Tenth, and Eleventh Circuit cases).

job duties and pay provisions, and are victims of a common policy or plan that violated the law." *Bimbo Bakeries,* 2019 DNH 020, 2019 U.S. Dist. LEXIS 17127, at *5-*6.  The burden is fairly lenient, *see id.*, but "it still has teeth," *see Cruz*, 699 F.3d at 569.  While the required factual showing is "modest," it must be more than unsupported allegations, *see id.*, and often requires at least affidavit support of the Plaintiff's allegations, *see Trezvant v. Fidelity Employer Services Corp.*, 434 F. Supp. 2d 40, 43 n.2 (D. Mass. 2006).  The lenient, but real, burden of proof exists "as a matter of sound case management . . . to avoid a frivolous fishing expedition at the employer's expense." *Torrezani v. VIP Auto Detailing, Inc.,* 318 F.R.D. 548, 557 (D. Mass. 2017) (quotations omitted).

The "second stage" occurs after the Court decides in the "notice stage" that there is enough factual support to believe there are other similarly situated workers affected by a common policy.  Potential plaintiffs are provided notice and an opportunity to opt-in.  Thereafter, following discovery into the workers who opted in, the defendant may move to "decertify" the collective action.  The Court then conducts a more searching factual inquiry to determine whether the opt-in plaintiffs are indeed similarly situated and focuses on the "actual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action."  *Bimbo Bakeries*, 2019 DNH 020, 2019 U.S. Dist. LEXIS 17127, at *4-*5 (quoting *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 364-65 (D. Me. 2010)).

As stated, the First Circuit has only hinted at the propriety of the two-stage "certification" process, and there appears to be a circuit split on the issue.  The Fifth Circuit just recently decided in an FLSA classification case that the two-step *Lusardi* approach should be abandoned

in favor of a single, more searching review of the similarity between putative collective members. *See Swales v. KLLM Transp. Servs.*, Docket No. 19-60847, 2021 WL 98229, 2021 U.S. App. LEXIS 827 (5th Cir. Jan. 12, 2021). *Swales* is attached hereto as Exhibit B. It provides a comprehensive history and explanation of the *Lusardi* approach, the competing minority approach of requiring FLSA collective actions to comply with Rule 23 requirements, and the Seventh Circuit's middle ground approach of requiring an FLSA collective action plaintiff to prove predominance of common issues over individual issues. As discussed in more detail below, the importance of the *Swales* decision is that it highlights the need to consider the merits surrounding classification when deciding whether to allow an FLSA collective action. That need is why it makes far more sense in this case to proceed to summary judgment and decide the classification issue first.

### IV. JUDICIAL ECONOMY AND FAIRNESS TO ALL PARTIES ARE STRONGLY ON THE SIDE OF DECIDING CLASSIFICATION FIRST.

There is no provision of the FLSA or the Federal Rules of Civil Procedure that requires the Court to decide conditional certification and issue notice before focusing on the merits. In fact, it is common for the courts to decide both dismissal motions and motions for summary judgment prior to Rule 23 certification, even though the rule (unlike the FLSA) commands a decision at an "early practicable time." *See* Manual for Complex Litigation (4th) § 21.133 at 252 (noting that in empirical studies approximately 30% of class actions were disposed of by dismissal or summary judgment prior to certification). This court has confirmed that "[i]t is well-settled that, absent prejudice to the plaintiff, a court may decide a defendant's motion for summary judgment in a putative class action before taking up the issue of class certification." *Evans v. Taco Bell*, Docket No. 04-CV-103-JD, 2005 DNH 132, 2005 WL 2333841, 2005 U.S. Dist. LEXIS 13237 (D.N.H. Sept. 23, 2005). This is true in the FLSA collective action context

too. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1207 (10th Cir. 2015) (holding in FLSA case that "[the plaintiff] has presented no convincing argument that the district court was somehow constrained to rule on the class-certification motion *before* the summary-judgment motion. We submit that she cannot make this showing because no such obligation existed." (emphasis in original)).

Since the two-stage FLSA certification paradigm is at heart a case management tool, the Court should consider what is the most efficient way to manage this particular case. The answer here is clear: there is no advantage and serious disadvantages to hewing to the normal FLSA script of initial certification, discovery, second stage certification, merits motions, and then trial.

### A. Deciding Classification for Plaintiff Will Be Far Easier than Deciding Certification and then Subsequently Deciding Classification for Numerous Plaintiffs.

The question is straightforward. Does it make more sense to decide first whether Plaintiff is an independent contractor or does it make sense to figure out whether there are workers similar to her and then decide whether Plaintiff and all those workers are independent contractors? Deciding Plaintiff's classification first is the clearest way to answer the central questions in this case: does a firm like Medicus, that is not in the healthcare business but places temporary, sporadic workers at healthcare facilities, employ the workers even though the workers do not work at any Medicus facility (where no healthcare is provided), are not prohibited from working elsewhere, are not supervised by any Medicus employee, and are not provided with any tools or equipment by Medicus? If Plaintiff is challenging that entire business model as setting up an employment relationship, it makes far more sense to test that business model with one summary judgment motion than dozens or hundreds from opt-in plaintiffs.

11

Deciding the classification issue on summary judgment will not be complicated. There are many classification decisions in the healthcare field that will help guide the analysis. *See, e.g., Gayle v. Harry's Nurses Registry, Inc*., 594 Fed. Appx. 714 (2nd Cir. 2014); *Chapman v. A.S.U.I. Healthcare & Dev. Ctr*., 562 Fed. Appx. 182 (5th Cir. 2014), *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2nd Cir. 1988); *Hughes v. Family Life Care, Inc*., 117 F. Supp. 3d 1365 (N.D. Fla. 2015); *Solis v. A+ Nursetemps, Inc*., Docket No. 5:07-cv-182; 2013 U.S. Dist. Lexis 49595 (M.D. Fla. Apr. 5, 2013). The nature of the relationship between the parties is readily apparent from the provisions of the "Independent Physician Agreement." In addition, the parties can engage in limited discovery to fill in specific details concerning Plaintiff's day-to-day activities at the Houston hospital, communications with Medicus concerning her work, Plaintiff's work for other entities, provision of equipment or services to Plaintiff, and any other indicia of control or lack of control. That can be completed fairly quickly and would include Plaintiff's deposition, perhaps her husband's, presumably a 30(b)(6) deposition and others of Medicus employees, and document discovery. Some of that discovery is already in progress.

The Court's decision on summary judgment will be a natural fork in the litigation road. If summary judgment is granted, the case is over. If summary judgment is denied, the parties can brief and argue certification. In the latter situation, the advantage for the Court and the parties will be that they will approach certification knowing far more about the important facts concerning classification. For example, the Court will have considered and know whether it is important for classification purposes that Plaintiff only worked sporadically for most months, she also worked in her own practice with her husband, she was free to refuse any offered assignment or period of work (and did refuse on multiple occasions), that Plaintiff was able to and did negotiate the pay rate she would receive (including demanding bonuses), and that Plaintiff's job

12

as nurse practitioner involves the type of independent judgment and skill that is less indicative of an employment relationship. The Court will also have considered, on the other hand, that Medicus was the entity that paid Plaintiff (not the facility where she was located), gave her mileage expenses, and provided her malpractice coverage during her time at the Houston hospital (though not other insurance or any other equipment or services). All of these facts, developed at summary judgment, will then guide the certification analysis if summary judgment is denied.

By contrast, Plaintiff's suggested certification-first schedule is far more difficult, expensive, and wasteful of the Court's time. The Court will need to decide at an early stage whether the proposed class members are "similarly situated." The class described in Plaintiff's complaint is "[a]ll medical industry personnel of Medicus who were, at any point in the past 3 years, paid 'straight time for overtime' and classified as independent contractors." *See* Complaint ¶15. Plaintiff have since said in their proposed discovery plan that they intend to seek to include in the collective action only "'nursing professionals of Medicus' that were classified as independent contractors and not [*sic*] paid straight time for overtime in the past 3 years." *See* Competing Discovery Plans, Docket No. 41, at p.1, "Theory of Liability." But Plaintiff has not yet amended her Complaint to make this change.

Regardless of the exact class definition, the Court will be required to determine whether the proposed class members have similar job duties and pay provisions and subject to a common policy or plan. *See Bimbo Bakeries,* 2019 DNH 020, 2019 WL 440567. "[D]ifferences in work locations, work assignments, [and] compensation structures, are all relevant factors in assessing whether members of the putative class are sufficiently similarly situated." *See Johnson v. VCG Holding Corp.*, 802 F. Supp. 2d 227, 236 (D. Me. 2011). The problem is that before the parties

focus on the classification analysis neither they, nor the Court, will know what differences between the class members are meaningful.

There are myriad examples of how the parties and the Court will be operating in the dark. An obvious one is the nature of the work. Plaintiff worked as a nurse practitioner. Nurse practitioners have different levels of authority and decision-making over patient care than other putative class members, whether described as "Medical personnel" or other "nursing professionals."[3] Many cases, including in this Circuit, hold that the independent judgment and skill of a worker is relevant to the classification analysis, especially when such skill is gained through "formal education, an apprenticeship, or years of experience." *See Sigui v. M+M Comms., Inc.*, Docket No. 14-CV-00442-MSM, 2020 WL 5258777, 2020 U.S. Dist. LEXIS 161791 (D.R.I. Sept. 3, 2000). If so, it will be important to explore, during certification, differences in authority between class members to make sure the class members are similar enough to litigate their claims in one case. In other words, is an independent Nurse Practitioner with autonomous diagnosing and prescribing authorities sufficiently the same as a licensed practical nurse, who has neither, so that it makes sense to try their cases together? Under Plaintiff's approach, that question will have to be answered at an early stage with no real understanding of how Plaintiff's level of skill and independent judgment balances out in the six-factor economic reality test. Summary judgment is the way to test with facts whether

---

[3] Indeed, even nurse practitioners' level of authority or "scope of practice" differs by state. In many states, including New Hampshire, a nurse practitioner may operate independently and prescribe medication. *See* RSA 326-B:11. In other states, the nurse practitioner's scope of practice is restricted such that he or she has to either affiliate with a physician or be supervised by a physician. *See, e.g.,* 8 Calif. Bus & Prof. Code § 2836.1(d) (providing that NPs may order drugs under physician supervision).

independence of authority matters in this case, so the parties will know the answer when they argue certification.

Other obvious differences are the different locales to which workers were assigned and their different schedules. Does it matter for classification purposes that Plaintiff worked in a large facility, which presumably had supervisory medical professionals above her and/or policies that guided her work? If so, the lack of such supervision over other potential class members who worked at smaller offices could be enough to mean those class members aren't similar enough to join their case with Plaintiff. Similarly, does it matter for purposes of the economic reality test that Plaintiff worked only a few days a month for most of the time she contracted with Medicus and arranged her schedule so that she could work at her own practice with her husband? Obviously, Medicus believes so, since that indicates she could and did work with other entities and was not reliant on Medicus for her economic security. *See*, *e.g., Preacely v. AAA Typing & Resume, Inc.*, Docket No. 12-1361, 2014 U.S. Dist. LEXIS 182946, at *17 (S.D.N.Y. Apr. 29, 2014) ("In addition, Preacely's timesheets indicate that his work schedule at AAA was sporadic, which would provide Preacely with an opportunity to pursue other work."). If so, during certification it will be meaningful to know whether potential opt-in plaintiffs worked similar, sporadic schedules or a more traditional employee-like, full-time schedule.

Finally, what is the effect of any circumstances unique to Plaintiff? In other words, even though the contractual relationship is structured so that Medicus does not control or oversee Plaintiff's work, were there communications or interactions that import some level of control or supervision? If the relationship as structured in the contract is a contractor arrangement but is in practice an employment relationship for this Plaintiff, the certification analysis will obviously

15

heavily depend on whether there were similar deviations in the structured relationship for other putative class members.

The point is that until the parties develop and argue the classification issue, no one, not the parties, not the Court, will know whether such differences among potential class members are immaterial to the litigation or will instead require individualized determinations about classification that make a collective action inappropriate. This is the Fifth Circuit's point in *Swales*, a classification case like this one. The *Swales* court rejected the *Lusardi* framework of assessing initial certification before exploring the merits because without at least considering what level of control the defendant had over plaintiffs, the district court had no way of knowing whether opt-in plaintiffs were similarly controlled (or free from control):

> the threshold issue here depends on the economic-realities test, which asks how much control the employer had over the independent contractor. Thus, the district court needed to consider the evidence relating to this threshold question in order to determine whether the economic-realities test could be applied on a collective basis. If answering this question requires a highly individualized inquiry into each potential opt-in's circumstances, the collective action would quickly devolve into a cacophony of individual actions.

*Swales*, ____ F.3d _____ (slip op. at 19).

The *Swales* court decided that a single-step, more-searching certification analysis following targeted discovery into the differences among the class was the appropriate way to proceed. That would obviously be preferable to flying blind at the notice stage, but the better way in this case to determine "whether the economic-realities could be applied on a collective basis," is to first determine what Plaintiff is challenging. Is it the structure of the relationship, i.e., the terms of the Independent Physician Agreement, or factors unique to Plaintiff? Summary judgment following limited discovery about classification is the easiest way to flesh this out.

In summary, if the Court decides summary judgment first, no effort by the Court or the parties will be wasted.  Summary judgment will be either be granted or the parties will approach certification with far more clarity on the important differences between class members.  On the other hand, deciding conditional certification substantially risks squandering the Court's and the parties' time – briefing and deciding conditional certification, only to find out later on that either (1) the Plaintiff and class members lose because the structured relationship is in fact an independent contractor relationship, not employment, or (2) individual circumstances of the class members may make them employees, meaning there should have been no collective action in the first place.  The Court should arrange the litigation to avoid the chance for such wasted efforts.

### B. There Is No Downside to Plaintiff or the Class Members by Deciding Summary Judgment First.

Thus, proceeding to the merits first has numerous upsides – it can be done cheaply and efficiently, using a single summary judgment motion versus dozens or more; and it will make for a better certification analysis, guided by the facts that are found important during summary judgment.  There is also no downside to the Plaintiff or the class members in getting to the heart of the dispute first.  When the parties argued the issue to the Magistrate Judge, the Plaintiff claimed that delaying a certification decision will result in severe prejudice to the putative class members because until they opt in following initial certification their 2 (or 3) year statute of limitations continues to run.  Plaintiff is right that normally the statute runs until opt-in, *see* 29 U.S.C. §256(b), but it doesn't have to.  The Court has the ability to equitably toll the statute when certification is delayed through no fault of the plaintiff or class members.  *See Knox v. John Varvatos Enters.*, 282 F. Supp. 3d 644, 657-58 (S.D.N.Y. 2017).  That is appropriate here, and Defendants would stipulate to an order tolling the limitations period while the parties engage

in limited discovery and briefing over the classification period, as provided in the Proposed Order, Exh. C.[4] Defendants aren't trying to run out the clock; they are trying to get to the heart of the dispute in the most direct way for themselves, Plaintiff, and the Court.

Resolving classification first also saves both parties the time and expense of unnecessary class discovery. If summary judgment is granted, there will obviously be no need to delve into extensive class-wide discovery. If summary judgment is denied, the parties will be able to target certification discovery to the important issues flagged in the briefing and decision. Of course, Plaintiff is entitled to reasonable attorneys' fees if she ends up winning her case, *see* 29 U.S.C. § 216(b), and so won't be put out by some additional discovery. But there is no guarantee she will win, and cases shouldn't be structured to maximize attorneys' fees awards for potentially needless discovery.

Thus, the only conceivable downside for class members in litigating classification first is that the Court might grant summary judgment and they are never allowed an opportunity to opt-in and show how their case might be different from Plaintiff's. Perhaps they would have argued they were overseen in a way that Plaintiff wasn't, were paid differently, didn't have another job like Plaintiff, or that in some other way their situation is different. But that just shows why it doesn't make sense to certify first. If the Court will be drilling down to individual details and

---

[4] There should be no tolling for the time period prior to issuance of the proposed tolling order because Plaintiff's Texas counsel is largely responsible for much of the delay in the case. Plaintiff's Complaint was originally filed in late August 2020 in the Southern District of Texas. Because there is a mandatory New Hampshire forum selection clause in the Independent Physician Agreement, Medicus sought to transfer the case here. Plaintiff's counsel would not agree to transfer. After Medicus filed the motion to transfer, Plaintiff sought and received an extension of time to object, but then failed to object and simply let the Texas court rule, approving transfer. The result is that even if Plaintiff files her Motion for Conditional Certification immediately and the court grants it expeditiously, the putative class members have been deprived of around six months of claimed overtime by the dilatory actions in Texas.

18

issuing contradictory summary judgment rulings based on those details, it would be exactly the "cacophony of individual actions," *Swales,* Slip Op. at 19, that should not be tried together.

## VII.   CONCLUSION.

For the foregoing reasons, Defendants request that the Court issue an order in the form of Exhibit C, which stays the limitations period for future opt-in plaintiffs if the case is certified as a collective action, allows the parties to confer on the necessary limited discovery required to decide the classification issue, engage in limited discovery, file cross-motions for summary judgment, and then, if necessary, conduct another Rule 26(f) conference to structure the litigation after summary judgment.

Respectfully submitted,

Medicus Healthcare Solutions, LLC et al.

By Their Attorneys,

SHEEHAN PHINNEY BASS & GREEN, PA

Dated:  February 5, 2021     By:    */s/ James P. Harris*
                                    James P. Harris (NH Bar #15336)
                                    John-Mark Turner (NH Bar # 15610)
                                    1000 Elm Street, P.O. Box 3701
                                    Manchester, NH  03105-3701
                                    (603) 627-8152
                                    jharris@sheehan.com
                                    jturner@sheehan.com

                              and

                              PAUL HASTINGS, LLP

Dated:  February 5, 2021     By:    /s/ Kenneth W. Gage
                                    Kenneth W. Gage, pro hac vice pending
                                    200 Park Avenue
                                    New York, NY 10166
                                    (212) 318-6046
                                    kennethgage@paulhastings.com

## CERTIFICATION

I hereby certify that on February 5, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

                              */s/ James P. Harris*
                              James P. Harris